O’MALLEY, Circuit Judge,
concurring in part.
I concur in the result my colleagues reach today because I agree that, under the proper construction of the “release means” limitation, Cordis does not infringe the asserted claims of U.S. Patent No. 5,653,760 (“the '760 patent” or “the patent”). I disagree, however, with my colleagues’ construction of the term “device.” Accordingly, I do not join Parts II-A-1 or II-B-1 of the majority opinion.
I. Construction of “Device”
The majority construes “device” to mean a continuous sheet that excludes stents with open mesh holes. Majority Op. at 557-61. Upon review of the intrinsic record, I do not agree. The claim language is broad and the written description, while focused on the treatment of fractured bones with a sheet, discloses a host of other embodiments and treatment applications. Several of those embodiments cannot fairly be characterized as sheets. And, I find no clear and unambiguous disclaimer of those embodiments in the prosecution history. Accordingly, I would affirm the district court’s construction of “device” as something which comprises the limitations set out in the body of the claim.
Turning first to the claim language, it does not limit the claimed “device” to a “sheet.” It only describes three characteristics of the “device:” it comprises a layer; it is “capable of being shaped in three dimensions by manipulation by hands;” and it is “capable of substantially restricting the through passage of at least one type of macromolecule therethrough.” '760 patent col. 22 11. 29-47. As my colleagues recognize, “device” is a generic term, Majority Op. at 558, that under its common usage is not limited to devices in the form of a sheet. Accordingly, the proper inquiry before us is whether the meaning of “device” as it appears in the asserted claims is narrowed by the written description or prosecution history. In my opinion, it is not.
To find a special definition mandated by the written description, a term must be “clearly” redefined, and an “express intent” to do so must be evident from the *566 patent. See Elekta Instrument S.A. v. O. U.R. Scientific Inti, Inc., 214 F.3d 1302, 1307 (Fed.Cir.2000) (“While we have held many times that a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning, the written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term. Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning.”) (citations and internal quotation marks omitted); see also Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1329 (Fed.Cir.2009) (“Similarly, we will adopt a definition that is different from the ordinary meaning when the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.”) (internal quotation marks omitted); Cannon Rubber Ltd. v. The First Years, Inc., 163 Fed.Appx. 870, 875 (Fed.Cir.2005) (“These two cited instances, however, do not clearly indicate that the patentee intended to assign a more narrow definition to the phrase ‘in the body’ than it would otherwise possess.”). In my view, the patent contains no clear definition of “device” or express intent to narrow its meaning.
Admittedly, in many instances, the patent includes descriptions of the invention being composed of a sheet,[1] accomplishing certain functionality using a sheet,[2] or being provided as a sheet.[3] Those statements, standing alone, could conceivably impart a special definition to “device” by implication.[4] When read as a whole, however, the written description detracts from the notion that “device” has a special meaning. Although it focuses on the treatment of fractured bones with a sheet, the written description discloses numerous other physical forms which the patented invention can take, some of which decidedly are not sheets. It describes a sheet as one possible embodiment. See, e.g., '760 patent col. 7 ll. 57-60 (“According to one embodiment, a single sheet that is flexible in three dimensions and minimally porous to macromolecules, is wrapped around or affixed to a fractured tissue.”); id. col. 13 1. 66 — col. 14 1. 2 (“The principal embodiment of the present invention is a sheet with the same characteristics as the malleable, minimally-porous anchoring component, 3, of the Malleable Fracture Stabilization Device with Micropores.”). It is almost unnecessary to restate that, “although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.” Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed.Cir.2005) (en banc).
*567 A close look at the written description reveals the breadth of its disclosure. The written description begins with a “Background of the Invention” section with a “Field of the Invention” subsection stating the “invention relates to the treatment of injured tissues within human or animal bodies, specifically to the way injured tissues are joined and the way macromolecules are directed to promote healing.” '760 patent col. 111. 21-24. This statement seemingly refers to embodiments relating to the treatment of fractured bones. But the Field of Invention section goes on to say that, “[a]lthough I [the inventor] will frame this invention initially in terms of traumatic injuries, I will also discuss this invention in the treatment of many other conditions including metastases, infections, metabolic conditions such as osteoporosis, primarily neoplasms, and vascular disease.” Id. col. 1 11. 27-32. This statement significantly broadens the scope of the disclosure, as does the text that follows.
The Background section proceeds to discuss the state of the art in the field of bone fracture fixation, in a subsection titled “Description of Prior Art.” Id. col. 1 1. 33 — col. 6 1. 10. But the patent notes that other injuries are also implicated by the invention: “many tissues are commonly fractured in traumatic injury, e.g., the liver, the kidney, the bowel, the bladder, the spleen and the testicle, perhaps the most often injured tissues are the bones.” Id. col. 1 11. 39-42. Returning to bone fractures, the patent discusses techniques used to treat bone fractures, problems arising when bone fractures are treated, and different fixation devices used on bone fractures (including compressions plates, intramedullary rods, porous substrates, bone chips, implantable gels, in-jectable cements, polymer coated sheets, non-porous grafts, and Saffraris micropo-rous device disclosed in U.S. Patent Application Ser. No. 08/11,745, which issued as U.S. Patent No. 5,466,262 (“the '262 patent”)). Id. col. 2 1. 43 — col. 6 1. 10. Still within the Background of the Invention section, the patent describes the present invention, calling it an improvement of the device disclosed in the '262 patent and discussing it specifically in the context of bone fracture fixation. Id. col. 6 11. 11-62. But, in a subsection entitled “Objectives of the Present Invention,” the patent moves beyond bone fractures and discloses features of the invention touching upon other medical applications, i.e., the invention provides “a unique method and apparatus that can be deployed via endoscope, catheter, or open surgical procedure that can serve both to preferentially direct endogenous macromolecules and release treating materials while also providing structural support to hollow viscera, solid organs, or blood vessels.” Id. col. 7 11. 20-26.[5]
The next subsection, entitled “Summary of the Invention,” focusing again on bone fractures, states that “[t]he invention is a unique method of fracture stabilization and way to restrain interfragmentary macromolecules using a single, flexible minimally porous sheet.” Id. col. 7 11. 34-36. It goes on to describe aspects of the patented invention, such as its one-layer construction, its ability to selectively restrain macromolecules, and the option of affixing treating material to its surface. Id. col. 7 1. 38 — col. 9 1. 11. Although, up to now, this section seems limited to bone fracture applications, the patent next states that the invention can “be introduced into the medullary cavity, blood vessel and hollow viscera using a percutaneous delivery sys *568 tem.” Id. col. 9 11. 12-14. It discusses embodiments in which the invention is rolled up and deployed via catheter or introducer needle, manufactured as a stent, or deployed via endoscope. Id. col. 9 11. 15-30. These embodiments, the patent explains, can be used to treat the inner walls of bones, blood vessel walls, hollow viscera lumen, abscess cavities, medullary cavities, solid organs (e.g., the liver, biliary system), or hollow organs (e.g., the esophagus), allowing for the treatment of inflammatory conditions or metabolic conditions such as osteoporosis. Id.
After sections describing the drawings and figures of the patent, a section entitled “Description of the Preferred Embodiments” elaborates on the numerous applications for the claimed invention. This section first describes the structure of the claimed device, the attachment of treating material to its surface via chemical bond, the construction material for the device, and the various treating materials that can be used. Id. col. 13 1. 48 — col. 16 1. 6. Regarding potential treating materials, the patent states that, “[a]lthough originally engineered to deliver bone growth factors, the device can deliver any of a number of treating materials including but not limited to bone morphogenetic proteins, nerve growth factors, extracellular matrix components, e.g., flbronectin and laminin, connective tissue growth factors such as fibroblast growth factors, antibiotics, vitamins, cofactors, a growth factor, a glycosaminoglycan, a bioactive ion, nuclear or ionic radiation, radiofrequency, a molecule produced by fractured tissue, a pharmaceutical, a hormone, and living cells— either wild-type or genetically engineered.” Id. col. 15 1. 63 — col. 16 1. 6. Next, in a subsection entitled “Operation of the Invention,” the patent returns to bone fracture applications. Id. col. 16 11. 7-64. But the patent proceeds, in separate subsections, to discuss “several new and unexpected applications” of the inventions. Id. col. 17 11. 2-3. The invention can be used, for example, “to treat metastases,” id. col. 17 11. 16^16, (by delivering chemotherapeutic medicines), “to treat os-teomyelitis,” id. col. 17 11. 47-59, to treat herniated disks, id. col. 19 11. 21-23, to treat osteoporosis, id. col. 19 11. 27-37, to treat intraabdominal abscesses resulting from diverticulitis and inflammatory bowel disease, id. col. 19 1. 46 — col. 20 1. 7, to treat cystic tumors and aneurysms, id. col. 19 11. 7-8, “to treat vascular disease,” id. col. 20 11. 9-67, “to treat mycotic aneurysms,” id. col. 21 11. 1-3, to treat malignant biliary strictures cause by pancreatic head tumors, id. col. 21 1. 6-11, and to “deliver radiofrequency energy or radioactivity directed to the tumor,” id. col. 21 11. 38-47.
And, the invention can take many forms, being applied, for example, “within a fenestrated IM [intramedullary] rod,” id. col. 17 1. 63, “as a thin film to the surface of a solid rod,” id. col. 18 11. 12-13, as a solid, rigid Krishner wire used to treat finger fractures, id. col. 18 11. 21-29, as a spray “such that it is deposited in a thin film on the tissue,” id. col. 18 11. 31-32, as a rolled up sheet, id. col. 19 11. 5-20, and as a coating for vascular and biliary stents, id. col. 20 1. 9 — col. 211. 47. Most pertinently, when discussing the use of the invention as a coating for stents, the written description states that the “device can be manufactured with any stent,” id. col. 20 1. 65, and has “stent coating properties,” and the stents are described as “invention-coated,” id. col. 21 11. 5-7. In its final section, entitled “Ramifications and scope,” the patent describes the device again in the context of bone fractures, id. col. 2111. 49-59, but then mentions applications in “the medullary canal, hollow organs, and blood vessels,” id. col. 21. 11. 66-67, and states that “the device and method provided is *569 not only a major advance in bone fracture treatment over the prior art, but is also a significant advance in the treatment of other seemingly unrelated soft tissue pathology,” id. col. 22 11.18-22.
In sum, while long-winded and rambling at times, the written description provides a broad disclosure touching upon several medical applications and physical structures. Its primary focus is the treatment of bone fractures with a minimally-porous sheet, but it also discloses a laundry list of other embodiments. Following this broad disclosure, the patent. contains several claims that are limited to no specific medical application. Instead, they are directed generally to devices that “promote healing of a damaged tissue,” id. col. 22 1. 30, methods “of treating damaged tissue to promote repair,” id. col. 23 11. 14-15, and methods “of treating tissues in human or veterinary medicine,” id. col. 24 11. 13-14. With this broad disclosure in mind, I turn to the present claim construction dispute.
Given the host of medical applications disclosed for the claimed device and the various structural forms the invention can take, I am unable to limit the broadly worded claims to any particular embodiment or application. The term “device” provides no vehicle for doing so. It is not possible, moreover, to describe some of the disclosed embodiments as “sheets.” For example, one would not describe a thin film on the surface of a solid rod, see id. col. 18 11. 12-14, or wire-like structures used to treat finger fractures, see id. col. 18 11. 21-29, as “sheets.” This is so even if one can stretch the spray and stent-coat-ing embodiments so as to call them sheets. See Majority Op. at 559-61. Additionally, the patent indicates that it is the claimed “layer,” as opposed to the claimed “device,” that is a sheet; it makes several references to the “minimally porous sheet,” and it is the “layer” that, according to the claims, is “minimally porous.” Compare '760 patent col. 22 11. 32-34 (claim 1 indicating that the “layer” is made “of flexible material that is minimally porous to macromolecules”), with id. col. 8 1. 4 (“minimally-porous sheet”), and id. col. 8 11. 33 (“the minimally-porous sheet”). I simply cannot agree that the written description clearly redefines “device” as a “sheet.” See Elekta Instrument, 214 F.3d at 1307.
The portion of my colleague’s construction excluding “stents having open mesh holes” is unnecessary, moreover. See Majority Op. at 560. It is true that the patent distinguishes U.S. Patent No. 5,383,928 (“Scott”) because the sheath-covered stent disclosed in Scott “does not have means to restrain macromolecules between their sheath and the vessel wall,” and “cannot have the ‘directional drug delivery means’ necessary to restrain the medicine that their sheath delivers.” '760 patent col. 20 ll. 46-55. But the claims themselves already require that “the device be[ ] capable of substantially restricting the through passage of at least one type of macromolecule therethrough” and that “the layer hav[e] material release means for release of an at least one treating material in a directional manner____” Id. col. 22 11. 40-41, 45-47. By focusing on the stent embodiments, my colleague’s construction loses sight of the various other embodiments disclosed in the written description.
Perhaps aware of the weakness of their position under standard claim construction principles, my colleagues resort to the concept of prosecution history disclaimer to justify reversing the district court’s construction of this claim language. Indeed, they take the unusual step of beginning with a discussion of the prosecution history, elevating it to a prominence it does not deserve under Phillips. As noted by this *570 court en banc, “because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.” Phillips, 415 F.3d at 1317. The majority does not heed the hierarchy counseled in Phillips and, instead, begins by finding disclaimer and then searches the specification for disclosures consistent with their take away from the prosecution history. I cannot agree with either the structure or the result of their analysis.
As my colleagues concede, prosecution disclaimer requires “clear and unambiguous disavowal of claim scope.” Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 833 (Fed.Cir.2003). The burden to show prosecution disclaimer is high because “[cjlaim terms are entitled to a heavy presumption that they carry their ordinary and customary meaning to those skilled in the art in light of the claim term’s usage in the patent specification.” Elbex Video, Ltd. v. Sensormatic Elecs. Corp., 508 F.3d 1366, 1371 (Fed.Cir.2007) (internal quotation marks omitted). In this vein, we have “consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope.” Omega Eng’g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed.Cir.2003). Instead, “we have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer.” Id. at 1325 (citations omitted). I see no such unambiguous, deliberate disavowal in the relevant exchanges with the examiner.
During prosecution, Saffran admittedly distinguished U.S. Patent No. 4,911,717 (“Gaskill”) by stating that “[t]he device is a sheet rather than a pre formed chamber (Gaskill).” See, A1100; A119; A1127. This statement no-doubt clearly and unambiguously disclaims the embodiments disclosed in Gaskill; i.e., pre-formed chambers. But this statement does not unambiguously limit to “sheets” all forms which the claimed device can take. There was no need to do so to differentiate the claims at issue here from what was disclosed in Gaskill. Gaskill was not about stents or treating bone fractures. Gaskill is addressed to an “intravascular emplaced” “artificial organ” “having a cell culture chamber adapted to receive living cells or tissue.” Gaskill col. 3 11. 54-58. In context, the point of Saffran’s disclaimer over Gaskill was that preformed chambers such as the disclosed “cell culture chamber” were not even within the scope of his claims. Instead, Saffran’s claims cover either chambers that are not pre-formed— because they are formed by the physician using a sheet[6] — or embodiments, both with and without sheets, that do not involve chambers at all. It would make no sense for Saffran to disclaim multiple embodiments in his own specification that have nothing to do with pre-formed chambers when a far narrower disclaimer was sufficient to differentiate his invention from Gaskill, as the district court found.
Although Saffran made this supposedly damning disclaimer when discussing a pri- or art reference dealing with pre-formed chambers — not sheets — my colleagues feel that his disclaimer is sufficient to notify the public that Saffran definitively and unambiguously redefined “device” as a “sheet.” See Omega Eng’g, 334 F.3d at 1325 (“To balance the importance of public notice and the right of patentees to seek broad patent coverage, we have thus consistently rejected prosecution statements *571 too vague or ambiguous to qualify as a disavowal of claim scope.”). To find so, they must not only take Saffran’s statement out of the context of the actual negotiation with the examiner, but disregard the multiple other embodiments disclosed in the patent. What Saffran unambiguously, clearly, and deliberately disclaimed were pre-formed chambers. I cannot find from this very directed exchange regarding Gaskill that Saffran unambiguously intended to disclaim such a substantial number of the embodiments disclosed in the written description.
Because a special definition of “device” is not mandated by either the written description or the prosecution history, I do not join Parts II-A-1 or II-B-1 of the majority opinion. I would instead affirm the district court’s construction of this term.
II. CONSTRUCTION OF “RELEASE
Means” Limitation
As stated above, I join Judge Lourie’s decision regarding the construction of the “release means” limitations. I write separately on this term only to note that, since this is a means-plus-function element construed under 35 U.S.C. § 112 ¶ 6, the scope of the term is inherently narrowed by the disclosure. Therefore, unlike our task when construing “device,” we are not required to examine the intrinsic record for a clear and unmistakable disavowal of claim scope when construing the “release means” limitation.[7] Limiting the scope of the “release means” limitation is analytically distinct from limiting the meaning of the term “device.” While, had Saffran chosen not to use a means-plus-function limitation, I might hesitate to limit the scope of the “release means” term, the outcome I reach today flows from his drafting choice.

. See '760 patent col. 13 11. 39-41 ("The device, 1, is composed of a single sheet of material that in its principal embodiment is supplied as a thin, pliable, fabric that is flexible in three dimensions by human hands.”).

. See id. col. 7 11. 34-36 ("The invention is a unique method of fracture stabilization and way to restrain interfragmentary macromolecules using a single flexible minimally porous sheet.”).

. See id. col. 16 11. 9-10 ("The invention is to be provided as a sterile sheet.”).

.See, e.g., Bell Atl. Network Servs., Inc. v. Covad Commc’ns Grp., Inc., 262 F.3d 1258, 1268 (Fed.Cir.2001) ("However, a claim term may be clearly redefined without an explicit statement of redefinition. Indeed, we have specifically held that the written description of the preferred embodiments ' can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.”) (citations and internal quotation marks omitted).

. The majority of the stated objectives, however, do relate to treatment of bone fractures. See '760 patent col. 6 1. 63 — col. 7 1. 31.

. Allowed claims in the '760 patent expressly include chambers formed during implantation — i.e., ones not “preformed.” See '760 patent col. 22 11. 60-61.

. We look instead to the specification or prosecution history for a clearly linked structure to perform the recited function. See B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed.Cir.1997).