NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1433

FITNESS QUEST, INC.,

Plaintiff-Appellee,

v.

JONATHAN MONTI,

Defendant-Appellant.

Steven M. Auvil, Benesch Friedlander Coplan & Aronoff, LLP, of Cleveland, Ohio, argued for plaintiff-appellee.  With him on the brief was Bryan A. Schwartz.

Arland T. Stein, Hahn Loeser & Parks LLP, of Columbus, Ohio, argued for defendant-appellant.  With him on the brief were Steven J. Mintz and Robert J. Diaz, of Cleveland, Ohio.

Appealed from:  United States District Court for the Northern District of Ohio

Judge Sara Lioi

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1433

FITNESS QUEST, INC.,

Plaintiff-Appellee,

v.

JONATHAN MONTI,

Defendant-Appellant.

Appeal from the United States District Court for the Northern District of Ohio in case no. 5:06-CV-2691, Judge Sara Lioi.

_____

DECIDED: May 12, 2009

_____

Before MICHEL, Chief Judge, SCHALL, and PROST, Circuit Judges.

MICHEL, Chief Judge.

Jonathan Monti appeals from the district court's grant of summary judgment that Fitness Quest ("FQ") did not infringe Monti's patent and did not breach a confidentiality agreement with Monti. We heard oral argument on January 3, 2009. As explained herein, the district court's grant of summary judgment is affirmed in part and vacated in part, and the case is remanded.

# I.    BACKGROUND

Monti is a named inventor on at least two patents relating to exercise equipment. In 2002, Monti tried to interest FQ in one of his ideas for an exercise machine. FQ and Monti entered into a confidentiality agreement under which FQ would not disclose or use confidential information provided by Monti. FQ, however, decided against purchasing Monti's exercise machine idea.

In October 2003, FQ began selling its "Ab Lounge" product line, which has been a commercial success. The Ab Lounge is a chair-like device on which users perform exercises similar to sit-ups. According to FQ, the Ab Lounge is based on the idea of another inventor, Wendy Wirth, and covered by Wirth's U.S. Patent No. 5,681,250.

U.S. Patent No. 6,932,749 (the '749 patent) was issued to Monti and a co-inventor on August 23, 2005. The asserted claims of the '749 patent are directed to an exercise apparatus that provides support for portions of a user's body during exercise.

In July 2006, Monti sent FQ a letter in which he stated that the Ab Lounge infringed the '749 patent and was based on Monti's 2002 confidential disclosures to FQ. FQ responded over a month later, denying Monti's accusations. In November of 2006, FQ sought a declaratory judgment that it neither violated the parties' confidentiality agreement nor infringed the '749 patent. Monti filed corresponding counterclaims.

The district court held a formal Markman hearing and construed a multitude of claim terms. Fitness Quest Inc. v. Monti, No. 5:06-CV-02691, 2007 U.S. Dist. Lexis 60195 (N.D. Ohio Aug. 16, 2007). Shortly before trial, FQ moved for summary judgment of non-infringement as to the asserted claims of the '749 patent (claims 15, 20, and 28). See Fitness Quest Inc. v. Monti, 560 F. Supp. 2d 598, 601 (N.D. Ohio

2008). Resolving this motion required the district court to engage in further claim construction, see id. at 604-09, and the constructions Monti challenges on appeal stem from this summary judgment ruling rather than the Markman order. The district court found that the Ab Lounge did not satisfy several limitations of the asserted claims and granted FQ's motion. See Fitness Quest, 560 F. Supp. 2d at 611. FQ also moved for summary judgment that it did not breach the confidentiality agreement, which the district court granted. Id.

Monti appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).[1]

## II.    DISCUSSION

"We review summary judgment decisions de novo, reapplying the standard used by the district court." Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1356 (Fed. Cir. 2005). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.    Infringement

There are two steps to infringement analysis: "first, the claims are construed, and second, the properly construed claims are applied to the accused devices." Elbex Video, Ltd. v. Sensormatic Elecs. Corp., 508 F.3d 1366, 1370 (Fed. Cir. 2007). Claim

---

[1] Before oral argument, we issued an order directing the parties to be prepared to discuss whether appellate jurisdiction existed over this appeal because it was unclear whether the district court had resolved declaratory judgment claims for invalidity and unenforceability of the '749 patent. At oral argument, Monti explained that the district court dismissed FQ's invalidity counterclaim, which FQ does not challenge on appeal. FQ stated that there was never a claim for unenforceability before the district court, and that FQ had instead raised unenforceability as an affirmative defense to Monti's counterclaim of patent infringement.

construction is a question of law reviewed de novo. Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Likewise, we review a district court's grant of summary judgment of non-infringement de novo. O2 Micro Int'l v. Monolithic Power Sys., 467 F.3d 1355, 1369 (Fed. Cir. 2006).

To construe a claim term, a court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time the patent application was filed. Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). In determining the meaning of a disputed claim limitation, courts look primarily to the intrinsic evidence of record, examining the claim language, the specification, and the prosecution history. Id. at 1312-17. Absent evidence to the contrary, words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art. Id. at 1312-13.

Claims, however, "do not stand alone" and are read within the context of the specification, which is the single best guide to the meaning of disputed terms. Id. at 1315. The specification may expressly or impliedly define a claim term contrary to its ordinary meaning. See id. at 1321. Similarly, the specification may contain a clear disavowal of claim term scope. Voda v. Cordis Corp., 536 F.3d 1311, 1320 (Fed. Cir. 2008). On the other hand, "[i]n examining the specification for proper context" it is improper to "import limitations from the specification into the claims." CollegeNet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1231 (Fed. Cir. 2005). And, of particular importance to this appeal, "claim terms are presumed to be used consistently throughout the patent." Research Plastics, Inc. v. Fed. Packaging Corp., 421 F.3d 1290, 1295 (Fed. Cir. 2005).

"Where the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." Gen. Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 983 (Fed. Cir. 1997).

Monti assigns error to the district court's rulings related to four limitations: "selectively applying a force," "back extensions," "body pad," and "transversely oriented support." All asserted claims contain versions of each of these limitations, except that "back extensions" is absent from claim 28.

### 1. "Back extensions"

The district court ruled that Monti had defined "back extensions" in the specification in such a way as to exclude all pushing movements. Fitness Quest, 560 F. Supp. 2d at 607. The district court determined that a user could not perform a back extension on FQ's accused device without pushing, and on that basis granted FQ summary judgment of non-infringement as to claims 15 and 20.[2] Id. at 607-08 & n.7.

### a. Claim construction

The district court ruled that the following passage from the specification constitutes a clear disavowal of all pushing for back extensions:

> A back extension is the backward movement of the torso and upper body to straight posture. Kinesiologically, this is characterized by the pulling of the lower back and postural muscles to extend the torso so that a person can assume straight posture. Many Nautilus® type machines have been constructed in the prior art to mimic this movement and add resistance to it, biomechanically, the core movement of this type of machine was a pushing movement. [sic] This is a distinct disadvantage of the prior art

---

[2]   When discussing the "back extensions" limitation, the summary judgment order typically refers to claims 15 and 20, see Fitness Quest, 560 F. Supp. 2d at 606, 608, but in one instance, refers to claims 15 and 28, id. at 607. The parties agree the reference to claim 28 is a typographical error.

methods of back extension. Also, this does not fall within the scope of Kinesiologically Correct™ which has been stated already hereinbefore.

'749 Pat. at 4:42-53. Were this apparent definition of "back extensions" the only discussion of the term in the specification, the district court would be correct that Monti clearly disavowed claiming any back extensions based on a pushing motion. However, the district court did not discuss the paragraphs immediately following, which describe an additional group of exercises as "back extensions":

> Another form of back extension is the prone body weight resistive type. This movement is done when an exerciser is in a prone position, thereby allowing gravity to affect the weight of the torso. The exerciser now controls and declines their [sic] torso and then returns to a parallel position, thereby exerting force on the lower back and postural musculature.

> In making the torso lighter when conducting a back extension on the present invention, several advantages are realized. The most specific and greatest general advantage of the present invention is that it allows the user who is a patient in physical therapy and exercisers of particular or gross weaknesses the ability to perform prone body weight resistive back extension and related exercises that they normally would not be able to do with any of the devices or methods of the prior art. Another greater and specific advantage of the present invention is that the counter balance buoyancy effect takes the emphasis off of the larger musculature namely the hamstrings and glutes and puts it on the para spinal muscles of the lower back. Another specific advantage of this present invention is that the exerciser can twist at the top of the range of motion, this targets one para spinal which is very difficult to realize in any of the prior art methods. A further specific advantage of this present invention is that extension exercises can be performed uni-laterally with one leg. A still further specific advantage of the present invention is that it is performed with a Kinesiologically Correct™ pulling movement as opposed to the prior art Nautilus® type machines that perform an incorrect and unnatural pushing movement hereinbefore described. In making the torso heavier the present invention imparts a very challenging mode of Kinesiologically Correct™ movements.

Id. at 4:54-5:18 (emphasis added). Figure 7 "is a side view of the variable gravity machine in use for back extension exercise." Id. at 7:51-52.



FIG.7

Specifically, figure 7

> is a side view of the variable gravity machine in use for back extension exercise. In performing a back extension on the variable gravity machine, the user interfaces with the machine as shown wherein the ventral part of the user's torso contacts the guide arm; wherein the body pad is set at an angle and is contacted with the user's thigh; wherein the lower body support is set at an angle close to parallel to the floor and the user's feet engage the rollers to provide stability to perform the exercise. During the assistive exercise, the gas spring and guide arm are in a position as shown, <u>the weight of the declining body causes the guide arm to rotate towards the floor</u> thereby causing the force production as described in FIG. 4. During resistive exercise, the gas spring (**23**) is selected for the resistive position and the guide arm (**31**) is selected to a hole in the dial plate force transferring mechanism (**28**) which positions the user in a desired position to exert added resistance to the torso. During the resistive exercise, the user pulls upon the guide arm (**31**) by grasping the pads (**37**) of the guide arm (**31**) thereby exhibiting the resistive force as described in FIG. 6.

<u>Id.</u> at 10:31-50 (emphasis added).

Monti argues that the phrase "the weight of the declining body causes the guide arm to rotate towards the floor" indicates that "back extensions" in view of the specification must include some pushing movements. Monti's reading would be plausible if not for the clear criticism of the Nautilus-type pushing movements. <u>See</u> <u>id.</u>

2008-1433                                    7

at 4:46-53, 5:11-15. Reading the specification "as a whole," as courts must, one way to harmonize (a) the disavowal of pushing with (b) the weight of a user's torso driving the guide arm towards the floor is by limiting "pushing" to an active motion requiring muscle exertion. Excluding a user passively resting her weight on the guide arm from "pushing" thus gives "back extensions" a coherent meaning throughout the specification.

An alternative way to harmonize these statements (and the one the district court used) is to limit "back extensions" to moving from a position where a user is bent at the waist to one in which her body is straight. Fitness Quest, 560 F. Supp. 2d at 607 ("'[B]ack extensions' is limited to those extensions where a user is not pushing against the transversely oriented support as she moves the torso and upper body backward to straight posture."). Under this interpretation, moving from a straight posture to a bent posture is not part of a "back extension."

Under either reading, we must reject Monti's argument that the '749 patent does not disclaim "all pushing movements, but" only "kinesiologically incorrect pushing movements." Thus, it is irrelevant if a user pushes when moving from a straight position to bending at the waist—this movement is not a "back extension" as defined in the '749 patent.

### b.      Infringement analysis

The parties agree that the Ab Lounge is used by pushing, not pulling; in fact, Monti's expert explained that someone using the Ab Lounge is "always pushing at least with his or her weight against the transversely oriented support." Since a user only pushes against the Ab Lounge when moving from a bent to a straight posture, she is not performing a "back extension" within the meaning of the '749 patent. The district court

therefore correctly granted summary judgment of non-infringement as to claims 15 and 20.[3]

## 2. "Horizontally oriented body pad" and "transversely oriented support"

The district court ruled that the "body pad" of the Ab Lounge was not "horizontally oriented," and that the Ab Lounge lacked a "transversely oriented support." Fitness Quest, 560 F. Supp. 2d at 608-09. Monti alleges that the district court's errors on these points have a common root.

### a. Claim construction

When analyzing the "body pad" limitation, the district court focused on claim 15 of the '749 Patent. Claim 15 requires, inter alia, "a horizontally oriented <u>body pad</u> with a <u>first end</u> and a <u>second end</u>, the body pad having a <u>longitudinal axis</u> and a <u>lateral extent</u> extending perpendicular to the longitudinal axis and between a <u>first side</u> of the body pad and a <u>second side</u> of the body pad."[4] (Emphasis added). Claim 28 contains essentially the same language.[5] Claim 15 also requires a "transversely oriented support extending

---

[3]    Because the district court correctly determined that FQ did not infringe claim 15, we necessarily reject Monti's argument that the district court should have granted summary judgment in his favor on the issue of infringement of claim 15.

[4]    Claim language involving "sides" and "ends" has been used as a somewhat obtuse way to describe a rectangular structure in a patent. See, e.g., U.S. Patent No. 5,240,109, claim 3 ("The shipping carton of claim 2 wherein the base of the box comprises a first end, a second end, a first side and a second side."); U.S. Patent 5,703,327, claim 1 (". . . a first substantially rectangular end panel having first and second end edges and first and second side edges . . ."); U.S. Patent No. 6,408,797, claim 1 (". . . a floor panel having a pair of parallel sides and a pair of ends extending between the sides . . .").

[5]    Claim 28 recites "a horizontally oriented body pad with a first end and a second end <u>and an auxiliary body support adjustably coupled to the user support and extending from the second end of the user support adjacent the second end of the body pad</u>, the body pad having a longitudinal axis and a lateral extent extending

---

substantially across the entire lateral extent of the <u>body pad</u>." (Emphasis added). Claim 28 instead requires a "transversely oriented support extending substantially across the entire lateral extent of the <u>user support</u>." (Emphasis added). (Neither the parties nor the district court attachs much significance to this difference between claims 15 and 28, <u>see e.g.</u>, <u>Fitness Quest</u>, 560 F. Supp. 2d. at 609 n.9, and we therefore assume that this difference is not relevant to this appeal.)

The district court, accepting Monti's argument on this point, determined that "body pad," as well as the "first end" and "second end" of the body pad, needed no construction. <u>Fitness Quest</u>, 2007 U.S. Dist. Lexis 60195 at *9, *15, *33-34. The parties agreed that these terms should be construed identically for claims 15 and 28. <u>Id.</u> at *33-34. Monti does not challenge the district court's claim construction on appeal.

### b. Infringement analysis for "body pad"

FQ's accused device has a back and seat outlined by what is essentially a tubular steel rectangle with a pair of hinges joining the back and seat sections of this frame. A single, continuous piece of fabric forms both the seat and the back portions of FQ's accused device, and is depicted in the Ab Lounge manual:

---

perpendicular to the longitudinal axis and between a first side of the body pad and a second side of the body pad," with emphasis added to show the language that does not appear in the corresponding section of claim 15.



Monti argued to the district court that the seat of FQ's accused device constituted the "body pad" of claims 15 and 28, and the back constituted the "transversely oriented support." Fitness Quest, 560 F. Supp. 2d at 608-09. The district court began with the assumption that the seat of the Ab Lounge indeed corresponded to the "body pad" of the '749 patent. Id. at 608. The district court determined that the three distinct edges of the seat (the two side edges and the front edge) constituted three of the recited "first side," "second side," "first end," and "second end," but that because only a single piece of fabric formed both the seat and back of the Ab Lounge, there was no determinate fourth boundary of the seat. Id. The court then reasoned that because the fabric of the seat and back of the Ab Lounge was of one continuous piece, the upper edge of the back of the Ab Lounge must therefore be the fourth boundary of the "body pad," and

that the "body pad" therefore corresponded to both the seat and back of the Ab Lounge. Id. at 609. Because the back of the Ab Lounge is (at least when the device is not in use) 8 degrees from vertical, the district court determined that the "body pad" is not "horizontally oriented." Id.

Monti argued to the district court that the phrase "transversely oriented support extending substantially across the entire lateral extent of the body pad" of claim 15 means that the transversely oriented support is at an elevation above the body pad. Id. The district court accepted this construction for the sake of argument. Id. Then, relying on its determination that the seat and back of the Ab Lounge constituted the "body pad," the district court concluded that the "transversely oriented support" (i.e., the Ab Lounge back) could not be above itself (i.e., the Ab Lounge seat and back). Id. The court alternatively ruled that the '749 patent required the "body pad" and "transversely oriented support" to be distinct structures, and that the back and seat of the Ab Lounge were not distinct because they were formed from a continuous piece of fabric. Id. at 609 n.9.

Were the facts pertinent to the infringement analysis undisputed, we would treat the analysis of whether the Ab Lounge satisfies the "body pad" limitation (the construction of which is unchallenged) as a question of law. But here, the facts were not completely undisputed. The district court stated:

> The differences in opinion of the parties' experts about how to measure the length of the "body pad" is illustrative. FQ's expert measures from both the seat pivot bolt and the chairback pivot bolt to the front of the device. Monti's expert measures the seat's length from the intersection of the seat and the chair's back to the front of the device.

Fitness Quest, 560 F. Supp. 2d at 608 (citations omitted). Neither of these experts, however, used the top of the Ab Lounge back as one endpoint for their measurements. While these experts produced slightly different measurements for the length of the "body pad," all measurements were around 20 inches. The top edge of the Ab Lounge back is a significantly different location than any of the three possibilities identified in the evidence discussed by the district court. Additionally, at his deposition, Monti's expert testified that he "would identify the body pad to be the seat" of the Ab Lounge and that the fourth boundary of this "body pad" was "at the back edge of the seat."

The district court disregarded Monti's expert's testimony regarding the location of the end of the seat, saying, "This intersection point chosen by Monti's expert is arbitrary, though, because the fabric is all one piece. Discerning the length of the seat is difficult precisely because the fabric has no defined stopping point in this direction, besides going all the way up to the top of the machine." Id. at 608-09. However, the district court identified no basis for its requirement that the "end" be a "defined stopping point," despite Monti's evidence that the seat of the Ab Lounge had a fourth boundary. The district court did not construe the term "end" and neither side asks us to construe the term on appeal; in the absence of a contrary claim construction, the district court erred by limiting the meaning of the term "end" to an end with a "defined stopping point."

"[T]he fundamental premise of a grant of summary judgment is that no reasonable jury could find other than in favor of the movant, when all reasonable factual inferences are drawn in favor of the non-movant." Gemmy Indus. Corp. v. Chrisha Creations Ltd., 452 F.3d 1353, 1359 (Fed. Cir. 2006). Neither the parties on appeal nor the district court in its opinion identified any evidence supporting the notion that the top

edge of the Ab Lounge back is the fourth boundary of the "body pad." The district court overlooked evidence contrary to its conclusion and settled on a conclusion lacking any evidentiary support, making summary judgment inappropriate.

The district court did not determine if, using the measurements of either expert, the Ab Lounge would satisfy the "body pad" limitation. However, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). If the answer to the question of whether the Ab Lounge would satisfy the "body pad" limitation is the same regardless of which point was taken to be the fourth boundary of the "body pad" (such as the seat pivot bolt, the chairback pivot bolt, or the intersection of the seat and the chair's back), there is no disputed issue of material fact and the district court should grant summary judgment. We will remand the case to the district court to make this determination.[6] Furthermore, because the district court—ignoring a factual dispute as to the location of the end of the body pad—decided that the "body pad" comprised the seat and back of the Ab Lounge, the district court's ruling that the "horizontally oriented support" (i.e., the back of the Ab Lounge) was not at an elevation above the "body pad" cannot stand.

---

[6]     We reject Monti's cursory argument that the district court should have granted summary judgment in his favor on the issue of infringement of claim 28. While the district court's reasons for finding that the Ab Lounge did not satisfy the "body pad" limitation were incorrect, this does not necessarily mean that the Ab Lounge does satisfy the "body pad" limitation.

### 3.    "Selectively applying a force"

At the claim construction hearing, FQ argued that "selectively" connoted selection by the user, while Monti argued that the machine performed the selection. Fitness Quest, 2007 U.S. Dist. Lexis 60195 at *23-24.  Specifically, Monti argued that "selectively applying a force" should be construed to mean "the force producing assembly applying an appropriate force to bias the guide member as needed during the exercise"; the district court adopted this construction.[7]  Fitness Quest, 560 F. Supp. 2d at 605 n.5.  In explaining his position, Monti argued

> So the force producing assembly in Claim 15 is talking about something different.  It's not talking about what the user could do, it's talking about what the, what the system can do.
>
> Why?  Because what happens is, within the system there may be a 120 pound load on it, or maybe a 220 pound man.
>
> So what the system has to do in the force producing assembly is it has to be selective.  How much energy am I going to absorb?  How much energy do I need to have this person complete the exercise?  That's where the selective comes in.  It's the system itself, the assembly itself that's selecting the amount of energy that's needed to complete the exercise, to assist.
>
> It's not, it's not some third party, it's not the user that's doing this.  The user, and the fact that you can have this dial up here that can be adjusted, that's in claim 16, 17, 29 and 30.
>
> . . . .
>
> Claim 15 is the system itself selectively applying the force to bias the guide member.
>
> This goes back to the point I made before.  You may have a 250 pound man or you may have a 120 pound woman, and they are both using the same system.  The system has to do a selection in terms of what, what amount of energy does it have so that it can then assist the, the user when they are moving against gravity.

---

[7]    On appeal, neither party challenges this claim construction.

In its motion for summary judgment, FQ argued that it was entitled to summary judgment because it was "undisputed that the bungees of the Ab Lounge (which Monti claims constitute the 'force producing assembly') do not apply force based on the weight of the user, but only based on how tightly they are pulled due to the angular displacement of the chair's back."  Id.  The district court ruled that Monti was bound under the doctrine of judicial estoppel by his example of users of different weights:

> Monti clearly advocated that the system must determine that amount of force to apply with reference to the weight of the individual using the device.  This position is directly contrary to his current position, which is that the force producing assembly applies a force irrespective of the user's weight.  The Court adopted Monti's previous construction and finds that FQ would suffer an unfair detriment if Monti was not estopped because Monti could defeat summary judgment by assuming a contrary position now that the facts show his prior position is unhelpful to him.

Id. at 606.  The district court therefore did not allow Monti to argue that "the force producing assembly stores energy according to the angular displacement of the guide member, and then applies a degree of force based on that angular displacement, regardless of the user's weight or other needs."  See id. at 605.  The district court then determined that because "[t]he undisputed evidence shows that the bungee cords of the Ab Lounge apply force to the chair regardless of the user's weight . . . [s]ummary judgment of noninfringement is therefore warranted."  Id. at 606.

Monti argues that judicial estoppel was not warranted in this situation for a host of reasons.  While we do not need to address each of his contentions, we do agree that the district court erred by applying judicial estoppel in this situation.

Monti asserts that issues of judicial estoppel are decided under regional circuit law, which FQ does not challenge.  "Whether judicial estoppel applies is a matter of regional circuit law."  Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1302

(Fed. Cir. 2002).  According to the Supreme Court, the primary factors for determining whether judicial estoppel should apply are as follows:

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (citations and quotations marks omitted).  Despite the Supreme Court's observation that "[b]ecause the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion," id. at 750 (citations and quotation marks omitted), the Sixth Circuit "review[s] a district court's application of judicial estoppel de novo," Eubanks v. CBSK Fin. Group, 385 F.3d 894, 897 (6th Cir. 2004).[8]

Judicial estoppel can apply to claim construction arguments.  See, e.g., Interactive Gift Express v. Compuserve Inc., 256 F.3d 1323, 1349 (Fed. Cir. 2001).  Here, however, the analysis falters on the first prong; Monti's position from the claim construction hearing was not "clearly inconsistent" with his position from the summary judgment motions.  Cf. SanDisk Corp. v. Memorex Prods., 415 F.3d 1278, 1291 (Fed Cir. 2005) (finding no "clearly inconsistent" positions despite appellee definitively advocating for different claim constructions before and after grant of preliminary

---

[8]     FQ points out that in an unpublished decision, Lewis v. Weyerhaeuser Co., 141 Fed. Appx. 420, 423-24 (6th Cir. 2005), the Sixth Circuit questioned the appropriateness of de novo review in light of New Hampshire, but admirably concedes this is the "minority" view within the Sixth Circuit.

injunction). Monti's example of the 120-pound woman and 250-pound man appears to have been an attempt to explain the difference between a machine "selectively applying" an amount of force as recited in independent claim 15 from a user "selectively adjusting" the amount of force in dependent claim 16. This was not "clearly inconsistent" with his arguments on summary judgment, making the application of judicial estoppel inappropriate.[9]

Because of the errors in the district court's rulings related to the terms "body pad," "transversely oriented support," and "selectively applying a force, the grant of summary judgment of non-infringement of claim 28 is vacated.[10]

## B.    Breach of contract

The 2002 confidentiality agreement between FQ and Monti prohibited FQ from using confidential information from Monti, but contained exceptions for information which FQ already knew or learned from another source. Fitness Quest, 506 F. Supp. 2d at 610. Monti states on appeal that he disclosed to FQ "the benefit of lowering the pivot point where the force producing assembly is mechanically linked to the guide member," and that FQ breached the confidentiality agreement by using this information

---

[9]    On remand, the district court may determine whether it should grant summary judgment to either party based on the unchallenged construction of "selectively applying a force" as "the force producing assembly applying an appropriate force to bias the guide member as needed during the exercise" without applying judicial estoppel.

[10]    Because we are remanding for further proceedings regarding FQ's alleged literal infringement of claim 28, we do not reach the issue of whether Monti's expert's testimony regarding infringement under the doctrine of equivalents was erroneously excluded. See, e.g., Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1304-05 (Fed. Cir. 2005) (reaching infringement under the doctrine of equivalents after upholding determination of no literal infringement). The district court is free to revisit this issue or determine whether additional evidence is needed on remand.

in designing the Ab Lounge. Monti argues that the district court erroneously granted summary judgment to FQ because the evidence the district court considered showed that FQ knew of a lowered pivot point before entering into the confidentiality agreement, but not that FQ knew of the benefit of lowering a pivot point. Accepting, arguendo, Monti's characterization of the district court's ruling, his argument nevertheless fails.

Monti cites two pieces of evidence in support of his contention: a video of him using a machine with a supposedly lowered pivot point and an e-mail. The video has no sound and no text. Monti's expert testified that by viewing the lowered pivot point in the video, he could discern the benefits of lowering the pivot point. However, Monti does not challenge the district court's finding that a lower pivot point was known to FQ before the parties entered into the confidentiality agreement. Monti cannot have this both ways—either disclosure of a lower pivot point necessarily discloses the benefit of lowering a pivot point (in which case FQ knew the benefit before entering into the confidentiality agreement), or disclosure of a lower pivot point does not disclose the benefit of lowering a pivot point (in which case the video does not disclose the benefit of lowering a pivot point). Either way, the video cannot serve as the basis for overturning the district court's ruling.

Monti's e-mail reads, in part: "After using the machine I noticed that it would be better for me to take the back extension out and lower the pivot point. Now the machine is very well situated for sit-ups, push-ups and leg lifts." It is possible to read this e-mail as disclosing that both (1) removing the back extension and (2) lowering the pivot point together makes the machine "very well situated for sit-ups, push-ups and leg lifts." However, even under this reading (the most favorable one to Monti), this e-mail does

not disclose that lowering the pivot point <u>alone</u> has any benefit. The district court was therefore correct to grant FQ summary judgment that it did not breach the confidentiality agreement, as Monti did not prove he disclosed to FQ the benefit of lowering the pivot point.

## CONCLUSION

For the reasons provided above, we affirm the district court's grant of summary judgment that FQ does not infringe claims 15 or 20 of the '749 patent, but vacate the district court's grant of summary judgment that FQ does not infringe claims 28 of the '749 patent. We also affirm the grant of summary judgment that FQ did not breach the confidentiality agreement. We remand for further proceedings in accordance with this opinion.