Opinion for the court filed by Circuit Judge PROST.
Opinion concurring in part, dissenting in part, and concurring in the result filed by Circuit Judge DYK.
Dissenting opinion filed by Circuit Judge MOORE.
PROST, Circuit Judge.
This is a patent infringement case under the Hatch-Waxman Act. See 35 U.S.C. § 271(e)(2)(A). Defendant-Appellant Novel Laboratories, Inc. (“Novel”) appeals the grant of summary judgment by the United States District Court for the District of New Jersey that U.S. Patent No. 6,946,149 (“'149 patent”) held by Braintree Laboratories, Inc. (“Braintree”) is infringed by the composition covered by Novel’s abbreviated new drug application (“ANDA”). See Braintree Labs., Inc. v. Novel Labs., Inc., No. 11-1341, 2013 WL 211252 (D.N.J. Jan. 18, 2013) (“Infringement Opinion”). The district court entered summary judgment of infringement based on its construction of four disputed claim terms. See Braintree Labs., Inc. v. Novel Labs., Inc., No. 11-1341, 2012 WL 4120907 (D.N.J. Sept. 19, 2012) (“Claim Construction Order”). Novel challenges the district court’s claim construction for two of those terms. Following a six-day bench trial on Novel’s invalidity defenses, the district found that Novel failed to prove that the asserted claims were invalid. See Braintree Labs., Inc. v. Novel Labs., No. 11-CV-1341, 2013 WL 2970739 (D.N.J. June 4, 2013) (“Validity Opinion ”). Novel also appeals those findings.
Because we agree with Novel that the district court erred in its construction of the claim term “clinically significant electrolyte shifts,” we reverse the district court’s claim construction of that term, vacate the district court’s grant of summary judgment of infringement, and remand for further factual findings to determine whether the composition covered by Novel’s ANDA product infringes under the new claim construction articulated herein. Further, we affirm the district court’s findings that the asserted claims of the '149 patent are not invalid.
I. BACKGROUND
Braintree is a pharmaceutical company that manufactures the SUPREP® Bowel Prep Kit (“SUPREP”), which helps to prepare patients for colonoscopies. The colon needs to be visually clear in order to successfully perform a colonoscopy, so prior to the examination patients typically drink several liters of a solution to induce diarrhea.
*1353 By the late 1990s, two colon cleansing options existed, both of which had some disadvantages. The first option was considered the safest but required patients to drink large volumes of unappetizing isotonic prep formulas, resulting in low patient compliance. The second option was to administer a low-volume, hypertonic prep. However, this option caused severe electrolyte shifts, leading to heart failure, kidney failure, neurological impairment, and even death.
Braintree’s '149 patent discloses a combination of magnesium sulfate, potassium sulfate, and sodium sulfate, which can be digested in small volumes to safely and effectively induce colonic purging without causing clinically significant electrolyte shifts. See, e.g., '149 patent abstract.
Claim 15, which the parties agree is representative, recites:
A composition for inducing purgation of the colon of a patient, the composition comprising from about 100 mL to about 500 mL of an aqueous hypertonic solution comprising an effective amount of Na2S04, an effective amount of MgS04, and an effective amount of K2S04, wherein the composition does not produce any clinically significant electrolyte shifts and does not include phosphate.
Ex Parte Reexamination Certificate, '149 patent col. 2 ll. 23-30 (emphases added).
Braintree alleges that SUPREP is a commercial embodiment of the '149 patent. Novel is a generic drug manufacturer.
II. PROCEDURAL HISTORY
On November 8, 2010, Novel filed an ANDA for a proposed generic copy of SUPREP. A few months later, Novel sent Braintree a Paragraph IV certification of invalidity/noninfringement letter asserting that “each of the claims of the '149 patent is either invalid or is not infringed” by Novel’s product. On March 9, 2011, Braintree filed this action seeking a declaration that Novel’s ANDA product infringes the '149 patent. Novel asserted counterclaims of noninfringement and invalidity.
After construing claim terms, the district court granted summary judgment of infringement in Braintree’s favor and denied Novel’s motion for reconsideration, ruling that SUPREP meets all limitations of the asserted claims. See Infringement Opinion, at *10. Following a bench trial regarding validity, the district court found that Novel “did not show proof that met the clear and convincing standard” that the asserted claims were anticipated, nor were they obvious or indefinite. Validity Opinion, at *25-26.
III. Discussion
This appeal concerns challenges to the district court’s claim constructions, its grant of summary judgment regarding infringement, and its findings following a bench trial regarding validity. Regarding claim construction, Novel argues that the district court misconstrued the claim terms “purgation” and “clinically significant electrolyte shifts.” Based on these erroneous claim constructions, Novel argues that the district court improperly granted Brain-tree’s motion for summary judgment on infringement. Regarding validity, Novel argues that the district court erred when it failed to find that (1) U.S. Patent No. 4,975,286 (“Hechter”) anticipates the asserted claims of the '149 patent; (2) the prior art, as understood by a person of skill in the art, renders the asserted claims obvious; and (3) the asserted claims are invalid because the term “purgation” is indefinite under 35 U.S.C. § 112, ¶ 2. We address each of Novel’s challenges in turn.
A. Claim Construction
Claim construction is a question of law, Markman v. Westview Instruments, *1354 Inc., 52 F.3d 967, 976-79 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review de novo without deference. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454-55 (Fed.Cir.1998) (en banc).
1. Purgation
The district court construed “pur-gation” to mean “an evacuation of a copious amount of stool from the bowels after oral administration of the solution.” Claim Construction Order, at *6. In adopting this construction, the district court rejected Novel’s argument that “purgation means cleansing,” concluding that “[a]l-though cleansing is a term in the specification of the '149 [p]atent, [the asserted claims] clearly adopt purgation as the methodology to improve visualization of the colon.” Id. at *3.
On appeal, the parties dispute the construction of the claim term “purgation” because the asserted claims cover compositions “comprising from about 100 mL to about 500 mL of an aqueous hypertonic solution.” Ex Parte Reexamination Certificate, '149 patent col. 2 11. 24-26. Brain-tree sells SUPREP in a kit containing two six-ounce bottles of concentrated solution, along with a dilution cup. A patient must dilute each of the two six-ounce bottles with ten ounces of water to form two sixteen-ounce solutions. Each of those half-dose sixteen ounce solutions has a total volume of 473 mL, which is within the range found in the asserted claims of the '149 patent, but Braintree concedes that neither dose accomplishes a full cleansing. Thus, Braintree’s “one bottle” infringement theory asserts that one (half-dose) bottle of SUPREP, diluted with water to become a sixteen ounce solution, falls within the asserted claims. This infringement theory can prevail if purgation means the “evacuation of a copious amount of stool from the bowels after oral administration of the solution,” which is something less than a full cleansing.
Novel argues that SUPREP does not infringe the asserted claims if “purgation” means cleansing, because a full cleansing only occurs after ingesting 946 mL of solution (i.e., two doses). Pointing to the specification, Novel alleges that the physiological event that the inventor contemplated was cleansing the colon for a colonoscopy. See, e.g., '149 patent title, abstract. Novel also relies on a passage in the specification which indicates that a dosage amount is “effective” only if it produces a clean colon in preparation for a colonoscopy or other surgical procedures. Id. at col. 5 11. 19-24 (“Optimally, the effective dose may be divided and administered, to the patient in two, or more administrations over an appropriate time period. Generally, 2 doses administered of equal portions of the effective dose, separated by 6 to 24 hours produce satisfactory purgation.”). Thus, Novel argues that an effective amount of solution must cleanse the colon.
Novel also points to Braintree’s 2010 patent term extension request, where Braintree represented to the U.S. Patent and Trademark Office (“PTO”) that “[t]he SUPREP product is an osmotic laxative for cleansing (ie., purging) of the colon....” J.A. 22172 (emphasis added). Therefore, Novel argues that Braintree’s representation that purgation is equivalent to cleansing reflects the proper construction of “purgation.”
While we have considered all of Novel’s arguments supporting its proposed construction of “purgation,” we find them unpersuasive. “In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to ‘particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as *1355 his invention.’” Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed.Cir.2001) (quoting 35 U.S.C. § 112, ¶2 (1975), amended by 35 U.S.C. § 112(b)). The asserted claims here only require that the compositions “induce” (i.e., bring about or start) diarrhea. The claims do not contain language that requires achieving a fully cleansed colon for a colonoscopy. Thus, while cleansing is the goal specifically articulated in the specification, it is not a claim requirement. See Comaper Corp. v. Antec, Inc., 596 F.3d 1343, 1348 (Fed.Cir.2010) (citation omitted) (“There is an inference ... that two different terms used in a patent have different meanings.”).
Novel’s reliance on the claim term “effective amount” is also misplaced. The district court construed “effective amount” as an amount of solution “necessary to produce a colonic purgation, while not producing clinically significant electrolyte shifts,” and Novel has not challenged this construction. Claim Construction Order, at *5. Since an “effective amount” only requires purgation and not a full cleansing, it is consistent to construe purgation as an evacuation of a copious amount of stool. Although the specification contemplates a scenario in which an effective amount could produce a full cleansing, it does so only in terms of a preferred embodiment. See Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1342 (Fed.Cir.2010) (citation omitted) (“ ‘[I]t is improper to read limitations from a preferred embodiment described in the specification — even if it is the only embodiment — into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.’ ”).
Finally, we conclude that Brain-tree’s statement that SUPREP is a product for “cleansing (i.e., purging)” in its patent term extension request does not redefine “purgation” as “cleansing.” Whether a statement to the PTO that includes “i.e.” constitutes a clear and unmistakable disavowal of claim scope depends on the context. See, e.g., Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1370-71 (Fed.Cir.2012). In this case, the post-issuance statement of the patentee does not modify the plain meaning of the word “purgation.” Thus, we hold that Brain-tree’s statement was not a clear and unmistakable disavowal. See SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187, 1199—1201 (Fed.Cir.2013); Elbex Video, Ltd. v. Sensormatic Elecs. Corp., 508 F.3d 1366, 1371 (Fed.Cir.2007).
For the aforementioned reasons, we affirm the district court’s construction of the claim term “purgation.”
2. Clinically Significant Electrolyte Shifts
The district court originally construed “clinically significant electrolyte shifts” to require “alterations in blood chemistry that are outside the normal upper or lower limits of their normal range or other untoward effects.” Claim Construction Order, at *6. Later, in considering the parties’ summary-judgment motions, the district court amended its construction and re-defined “clinically significant electrolyte shifts” to be “alterations in blood chemistry that are both outside the normal upper or lower limits of their range and accompanied by or manifested as other untoward effects.” Infringement Opinion, at *7 (emphases added). The district court explained that it modified its original construction to make it conjunctive because the specification refers to “electrolyte shifts leading to serious health problems for the patient.” Id. It further explained that the phrase “untoward effects” may refer to “those fatal side effects of the [prior art] solution because such side effects are re *1356 ferred to in the specification” and “is meant to show that electrolyte abnormalities are not clinically significant unless they lead to serious adverse health effects, like those caused by [the prior art].” Id.
On appeal, Novel argues that in requiring both alterations in blood chemistry and other untoward effects, the district court ignored the inventor’s clear definition of the term “clinically significant electrolyte shifts” in the specification. See '149 patent col. 2 ll. 47-51 (“The terms ‘clinically significant’ as used herein are meant to convey alterations in blood chemistry that are outside the normal upper or lower limits of their normal range or other untoward effects.”).
In defending the district court’s final construction, Braintree argues that the preferred embodiment — referred to as Solution D in the '149 patent — caused alterations in some patients’ blood chemistry, but those alterations were found to be “clinically insignificant.” '149 patent col. 10 11. 32-33. Thus, according to Braintree, the definition found in the specification would exclude Solution D, which is the preferred embodiment in the '149 patent. And “[a] claim construction that excludes the preferred embodiment ‘is rarely, if ever, correct and would require highly persuasive evidentiary support.’ ” Adams Respiratory Therapeutics, Inc. v. Perrigo Co., 616 F.3d 1283, 1290 (Fed.Cir.2010) (citation omitted).
Under our precedent, the patentee’s lexicography must govern the claim construction analysis. See Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed.Cir.2005) (en banc). Therefore, we disagree with the district court’s modification of the clear language found in the specification. We reverse the district court’s claim construction and construe “clinically significant electrolyte shifts” to be “alterations in blood chemistry that are outside the normal upper or lower limits of their normal range or other untoward effects.”
B. Infringement
We review the grant of summary judgment under the law of the regional circuit. Lexion Med., LLC v. Northgate Techs., Inc., 641 F.3d 1352, 1358 (Fed.Cir.2011). The Third Circuit reviews the grant of summary judgment de novo. Nicini v. Morra, 212 F.3d 798, 805 (3d Cir.2000) (en banc). Summary judgment is appropriate if the movant “shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a).
Based on its construction of “pur-gation,” which does not require a full cleanse, the district court found that one bottle of SUPREP meets the “purgation” claim limitation, as it will induce an evacuation of a copious amount of stool from the bowels and is a composition comprising 473 mL of an aqueous hypertonic solution. Infringement Opinion, at *9-10. We affirm the district court’s construction of this term, and we likewise affirm the district court’s finding that one (half-dose) bottle of SUPREP practices this claim limitation.
The district court also found that SU-PREP practices the “wherein the composition does not produce any clinically significant electrolyte shifts” limitation. Id. at *6-8. It based its conclusion not only on its erroneous construction of the term “clinically significant electrolyte shifts” but also on its importation of the claim terms “a patient” into this limitation. Id. at *8. The words “a patient” are found in the preamble. See Ex Parte Reexamination Certificate, '149 patent col. 2 ll. 23-24. The district court explained that, based on its review of the record, “it appears that the administration of the composition and evaluation of the electrolyte levels in [the asserted claims] were meant to be done on *1357 a per patient basis.” Infringement Opinion, at *8. It defined “a patient” to mean “one or more patients.” Id. It then found that “at least one patient to whom SU-PREP is administered will experience, or has experienced, no clinically significant electrolyte shifts.” Id.
“[I]f the claim preamble is ‘necessary to give life, meaning, and vitality’ to the claim, then the claim preamble should be construed as if in the balance of the claim.” Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed.Cir.1999) (citations omitted). Conversely, a preamble is not limiting “where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.” Rowe v. Dror, 112 F.3d 473, 478 (Fed.Cir.1997).
Neither party has argued on appeal that the district court erred in importing “a patient” into this limitation. However, the parties are at odds over whether the district court’s definition of “a patient” is correct. Novel argues that the district court’s definition limits the utility of the claimed compositions to administration in a single patient. Indeed, such an interpretation would allow a composition to meet the claims even if 99 patients out of 100 experienced clinically significant electrolyte shifts, as long as one patient did not.
In support of the district court’s definition of “a patient,” Braintree argues that “a patient” must mean one or more patients, as it cannot be the case that no infringement can occur if SUPREP causes a clinically significant electrolyte shift in a single patient.
We agree with Novel and conclude that, in this case, the district court’s definition of “a patient” is incorrect. In view of the proper claim construction of “clinically significant electrolyte shifts,” the district court’s application of the claim terms “a patient” leads to the absurd result of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients. Therefore, we instead interpret “a patient” to mean the general class of persons to whom the patented compositions are directed, i.e., a patient population. This definition of a patient is consistent with the “invention the patentee intended to define and protect.” Rowe, 112 F.3d at 478. Indeed, in the specification, the inventor states that his “objective was to find a well tolerated orally administered colonic purgative that ... avoided the risks of upset or electrolyte balance in patients.” '149 patent col. 4 11. 45-18 (emphasis added). In addition, the inventor states that a preferred embodiment has been “well tolerated by normal people.” Id. at col. 11 11. 43-44 (emphasis added). And in the '149 patent’s abstract, the inventor described his invention as “[a] compromise between convenient, distasteful, solid or low volume, hyperosmotic solutions which cause considerable fluid and electrolyte imbalances in patients and large volume, difficult to consume, iso-os-motic solutions.... ” Id. at abstract (emphasis added).
We note that there is evidence in the record that at least some patients experienced alterations in blood chemistry that are outside the normal upper or lower limits of their normal range. See, e.g., J.A. 924, 5059-71, 6683, 6694, 6759, 6831, 6833, 6849, 6857. Therefore, we conclude that there remains a genuine dispute as to whether SUPREP avoids producing any clinically significant electrolyte shifts in a patient population. We vacate the district court’s grant of summary judgment of infringement, and we remand this matter to the district court for further factual findings concerning whether such alterations qualify as “clinically significant electrolyte shifts” in accordance with the proper claim construction articulated here within.
*1358 C. Invalidity
Invalidity must be proven by clear and convincing evidence. WMS Gaming, Inc. v. Int’l Game Tech., 184 F.3d 1339, 1355 (Fed.Cir.1999). On appeal from a bench trial, we review the district court’s conclusions of law de novo and findings of fact for clear error. Brown & Williamson Tobacco Corp. v. Philip Morris Inc., 229 F.3d 1120, 1123 (Fed.Cir.2000).
1. Anticipation by Hechter
Anticipation is a question of fact, and a district court’s findings on this issue are reviewed for clear error. See Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1082 (Fed.Cir.2008). Below, the district court found that Novel “did not show proof that met the clear and convincing standard” that the asserted claims were anticipated by Hechter. Validity Opinion, at *25. The district court credited Brain-tree’s expert witness’s opinion that Hechter does not disclose several limitations of the asserted claims. Id. at *24. On appeal Novel argues again that Hechter anticipates the asserted claims of the '149 patent.
Hechter teaches first mixing 60 grams of a dry powder composition with one-liter of water and then later adding three additional liters of water prior to administration. Hechter col. 3 11. 52-62. Novel argues that Hechter expressly discloses the preparation of a one-liter hyper-tonic solution because during the first step, the composition in Hechter is mixed with one-liter of water. See id. at col. 3 11. 55-59. It alleges that Hechter further discloses that 1.6 liters, or 40% of its four-liter solution, is capable of cleansing the colon {Id. at col. 4 11. 13-16); 40% of one-liter is 400 mL. Novel also claims that the initial solution in Hechter is inherently hypertonic.
We note that during prosecution, the examiner initially rejected the claims over Hechter. See J.A. 21889. Braintree then added the word “hypertonic” to its claims, explaining that Hechter taught administering 3 to 4 liters of an isotonic solution, while the claims were directed to hyper-tonic solutions. J.A. 21906, 21913-14. In response, the examiner withdrew the rejections. J.A. 21922.
After reviewing Hechter and the '149 patent’s prosecution history, we conclude that Novel’s argument is flawed for at least three reasons. First, Hechter does not disclose administering this initial one-liter solution to a patient. And we find no clear error in the district court’s finding that skilled artisans would not have administered Hechter’s initial mixing solution because, as the '149 patent explains, “concentrating the large volume, [isotonic preparations] into smaller volumes does not achieve the same effectiveness, and is not as safe.” '149 patent col. 3 11. 26-28. Second, although theoretically the initial one-liter solution described in Hechter could be hypertonic in a patient, both parties’ experts agreed that the only way to know whether Hechter’s initial mixing solution was hypertonic would be to test it. See J.A. 21251-52, 21422, 21622. But Novel has no evidence to suggest that the initial mixture in Hechter has been tested in a patient population, let alone that it was found to be hypertonic. Id. Thus, Novel lacks clear and convincing evidence that Hechter teaches this limitation. Third, Hechter actually teaches away from administering a hypertonic solution, stating that its solution needs to be isotonic in order to avoid clinically significant electrolyte shifts. See Hechter col. 2 11. 9-39, col. 2 11. 60-67, col. 3 11. 15-16, col. 3 11. 38-40. For at least these three reasons, we affirm the district court’s finding that Hechter does not anticipate the asserted claims of the '149 patent.
*1359 2. Obviousness
Obviousness is a question of law, reviewed de novo, based on underlying factual findings, reviewed for clear error. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The district court found that Novel, which relied on sixteen prior art references, failed to prove obviousness by clear and convincing evidence. Validity Opinion, at *24. “[D]iscount[ing] [Novel’s expert’s] testimony on credibility grounds because some of his conclusions did not appear to be as reasonable,” the district court found that the prior art “did not direct a [skilled artisan] to combine sodium sulfate, magnesium sulfate, and potassium sulfate in a small volume hypertonic solution that causes purgation, does not produce clinically significant electrolyte shifts, and does not contain phosphate.” Id. at *22. The district court also found that the inventor’s “detailed experimentation” was far from the “tweaking” and “modifying” that Novel’s expert claimed. Id. at *23.
Novel relies on many references as an attempt to demonstrate that, at the time of the invention, one of skill in the art knew that: (1) sulfate salts caused purgation of the colon; (2) hypertonic, low-volume colon-cleansing solutions were preferable; (3) clinically significant electrolyte shifts should be avoided; (4) bowel preps should be administered in a split-dose regimen; and (5) bowel preps should typically avoid phosphates. It adds that the prior art consisted only of a limited number of known agents that may be combined to cleanse the colon without ingesting phosphate and without producing clinically significant electrolyte shifts. Further, Novel argues that all components in the asserted claims were known purgatives at the time of invention. Thus, Novel alleges that the asserted claims “ ‘simply arrange[ ] old elements with each performing the same function it had been known to perform’ and yields no more than one would expect from such an arrangement, [so] the combination is obvious.” KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398, 417, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) (citation omitted). Finally, Novel argues that before the '149 patent’s priority date, there was a need to: (1) avoid the use of phosphates in particular patient populations; and (2) develop a low-volume solution to improve patient compliance and efficacy. Novel claims the district court failed to consider the limited number of choices to meet those market preferences and pressures.
We disagree. As the district court correctly noted, Novel did not prove that one of skill in the art would have been motivated to combine so many references. In other words, it failed to prove a “plausible rationale] as to why the prior art references would have worked together.” Power-One, Inc. v. Artesyn Techs., Inc., 599 F.3d 1343, 1352 (Fed.Cir.2010). Further, in building its obviousness case, Novel relies on expert testimony which the district court found to be less credible. Validity Opinion, at *25. And the prior art, including Hechter, taught that safe bowel preps should be isotonic, not hypertonic like the claimed compositions. See, e.g., Hechter col. 2 11. 60-64. Therefore, we conclude that the district court did not err in finding that Novel failed to demonstrate that the asserted claims of the '149 patent would have been obvious at the time of the invention.
3. Indefiniteness
We review de novo the district court’s decision regarding indefiniteness, as it is a question of law. Ergo Licensing, LLC v. CareFusion 303, Inc., 673 F.3d 1361, 1363 (Fed.Cir.2012). The district court found that Novel failed to prove the claims indefinite by clear and convincing evidence. Validity Opinion, at *25-26. It rejected Novel’s argument that a skilled *1360 artisan would not understand the word “copious” — a term not used in any claim and only found in the district court’s construction of “purgation.” Id. at *25. On appeal, Novel argues that the district court noted but then ignored the clear import of the testimony from the inventor, who admitted explicitly that the term purgation “does not have a defined volume.” J.A. 21048^49. It points to further testimony on the record from a Braintree employee, in which the employee admitted: “I don’t think there’s any clear definition about what copious diarrhea means.” J.A. 21304.
We are not persuaded by Novel’s indefiniteness argument. It has failed to show why the word “copious,” a word that is not found in the claims but rather is used in the district court’s construction of “purgation,” is indefinite in this context. Descriptive words like “copious” are commonly used in patent claims, to “avoid[] a strict numerical boundary to the specified parameter.” See Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1217 (Fed.Cir.1995). Further, when asked what copious would mean to one of skill in the art, Braintree’s expert witness stated “[w]ell, copious is a lot.... I think anyone who has taken a bowel prep prior to [a] colo-noscopy, knows that it’s quite a bit of diarrhea that comes out.” J.A. 20161. We agree, and therefore we conclude that one of skill in the art would understand what a “copious” amount of diarrhea is in this context.
IV. Conolusion
For the foregoing reasons, we affirm the district court’s claim construction of “pur-gation.” However, we conclude that the district court erred in construing the claim term “clinically significant electrolyte shifts.” We reverse its claim construction and vacate its grant of summary judgment of infringement. Regarding validity, we affirm the district court’s findings that the asserted claims of the '149 patent are not anticipated, not obvious, and not indefinite. We remand this case to the district court for further proceedings consistent with this opinion.
AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED.